This opinion is uncorrected and subject to revision before publication in the New York Reports.
-----------------------------------------------------------------

No. 112
Doctor Fred L. Pasternack,
              Appellant,
        v.
Laboratory Corporation of America
Holdings, &c., et al.,
              Respondents.


              Cynthia S. Arato, for appellant.
              Frederick T. Smith, for respondent LexisNexis
Occupational Health Solutions Inc. formerly known as ChoicePoint,
Inc.
              Robert I. Steiner, for respondent Laboratory
Corporation of America Holdings.


ABDUS-SALAAM, J.:

        In this action sounding in, among other things,

negligence and fraud, plaintiff Fred Pasternack seeks to recover

damages from defendants Laboratory Corporation of America

(LabCorp) and ChoicePoint, Inc., arising from defendants' alleged

misconduct in performing and evaluating a random drug test that

he was required to take as an airline pilot.  We have accepted

two certified questions from the United States Court of Appeals

- 1 -

for the Second Circuit, asking us to determine (1) whether drug testing regulations and guidelines promulgated by the Federal Aviation Administration (FAA) and the Department of Transportation (DOT) create a duty of care for drug testing laboratories and program administrators under New York negligence law, and (2) whether a plaintiff may establish the reliance element of a fraud claim under New York law by showing that a third party relied on a defendant's false statements resulting in injury to the plaintiff.  We answer both questions in accordance with this opinion.

I.

The underlying facts and procedural history are summarized as follows:

Plaintiff is a physician and part-time Northeastern Aviation Corporation airline pilot.  He was required to submit to random drug testing pursuant to FAA regulations as part of its mandate to ensure "safety in air commerce and national security" (49 USC § 44701(a)(5)[procedures for transportation workplace drug and alcohol testing programs]; see also 49 CFR pt 40]).  ChoicePoint entered into a contract with Northeastern where it agreed to help administer Northeastern's drug program, including performing the services of a Medical Review Officer (MRO).  LabCorp, which provides specimen collection and drug testing services for private entities, entered into a contract with ChoicePoint to perform those services for Northeastern.

When performing their duties under these contracts, both ChoicePoint and LabCorp were required to comply with the DOT Regulations and the DOT's Urine Specimen Collection Guidelines (collectively, the DOT Regulations and Guidelines).  The stated purpose of the DOT Regulations "is to establish a program designed to help prevent accidents and injuries resulting from the use of prohibited drugs or the misuse of alcohol by employees who perform safety-sensitive functions in aviation" (14 CFR § 120.3).

On June 1, 2007, plaintiff was notified by Northeastern that he had been selected for random drug testing. On June 5, 2007, at about 1:10 PM, he appeared for drug testing at a LabCorp site located in Manhattan.  The urine sample plaintiff first produced at the test site was an insufficient quantity for testing.  This is referred to under the DOT Regulations as a "shy bladder" situation.  The DOT Regulations and Guidelines set forth procedures to be followed in such a situation, which include urging the employee to drink up to 40 ounces of fluid distributed reasonably through a three hour period, or until the employee has provided a sufficient urine specimen (40 CFR § 40.193; Department of Transportation, *Urine Specimen Collection Guidelines* [December 2006]).  At the time that plaintiff was tested, the DOT Guidelines provided that "[t]he collector must specifically tell the employee that he or she is not permitted to leave the collection site and if they do

so, that it will be considered a refusal to test."[1]

According to the complaint, Theresa Montalvo, a Patient Services Technician for LabCorp, told plaintiff that he would need to produce another urine sample, but did not explain the shy bladder procedure to him or urge him to drink additional fluids, and instead told him to return to the waiting room.  Plaintiff did return to the waiting room, but believed it was unlikely that he could produce a sufficient urine sample before needing to depart the collection site for a scheduled aviation medical examination he was performing.  He told Montalvo that he needed to leave, but would return to complete the test.  Montalvo did not inform him that leaving the collection site would be considered a "refusal to test."  She did tell him that she was required to notify Northeastern that he was leaving and asked when he would return.  Plaintiff told her she was free to contact Northeastern and that he would return the next day.  He returned to the LabCorp facility around 4:00 p.m. that same day, and Montalvo called Northeastern and obtained permission to take a second urine sample from plaintiff.  She noted on the chain-of-

---

[1]The DOT Guidelines have since been revised to state that "there is no requirement for the collector to inform the employee in a shy bladder situation that failure to remain at the collection site or otherwise fails to cooperate with the testing process constitutes a refusal. It is best practice for the collector to inform the employee that such behavior could lead an employer to determine that a refusal occurred" (DOT, Urine Specimen Collection Guidelines [July 2014] at 21, https://www.fta.dot.gov/documents/Urine_Specimen_Collection_Guide lines_July3_2014_A.pdf).

custody form (CCF), which Northeastern had given plaintiff pursuant to the DOT Regulations, that he had left and returned and that Northeastern had approved the second collection. Upon his return, plaintiff produced an adequate sample, which tested negative for prohibited drugs.

Plaintiff's CCF was later reviewed by a Medical Review Officer (MRO) at ChoicePoint, who determined that because plaintiff had left the collection site before the test was completed, there had been a "refusal to test" under the DOT Regulations. ChoicePoint reported this determination to the FAA, which prompted the FAA to interview Montalvo regarding the circumstances surrounding the urine specimen collection. As alleged by plaintiff, during the interview and in her subsequent signed statement, Montalvo did not tell the FAA investigators that plaintiff had told her during the initial collection that he planned to return to complete his collection. In November 2007, by Emergency Order, the FAA revoked all of plaintiff's airman certificates, finding that he had engaged in a refusal to test. It subsequently terminated plaintiff's designation as an Aviation Medical Examiner (AME) for the FAA, which gave him the authority to conduct FAA-mandated examinations for pilots. Thus, he was unable to pilot any flights or function as an AME.

Plaintiff appealed the termination of his AME designation to the FAA and that appeal was denied. He also appealed the revocation of his airman certificates to the FAA. A

hearing was held before an Administrative Law Judge (ALJ) at which both plaintiff and Montalvo testified.  Plaintiff claimed that he left the collection site with Montalvo's acquiescence, while she testified that he rushed out of the facility before she could explain the shy bladder procedures to him.  As previously noted, it was undisputed that Montalvo did not advise plaintiff that he would be deemed a "refusal to test" if he left the facility.  The ALJ upheld the revocation, as did the National Transportation Safety Board (NTSB).  Plaintiff appealed the NTSB's decision to the D.C. Circuit Court of Appeals, which vacated the decision and remanded the matter to the NTSB, holding that the NTSB's finding that Montalvo had been precluded from explaining the shy bladder procedure to plaintiff was not supported by substantial evidence (see Pasternack v Nat'l Transp. Safety Bd, 596 F3d 836 [2010]).  In September 2010, the NTSB remanded the case to the ALJ, directing that the ALJ make the necessary credibility findings concerning the interaction between plaintiff and Montalvo.  On remand, the ALJ again concluded that plaintiff had refused to test.  The NTSB again affirmed. Plaintiff appealed to the D.C. Circuit, which ruled in his favor once more, holding that "substantial evidence does not support the NTSB's determination that the collector did not impliedly give [plaintiff] permission to leave" and reversing the NTSB (Pasternack v Huerta, 513 Fed Appx 1, 2 [2013]). Subsequently, the FAA reinstated plaintiff's airman certificates and AME

designation and expunged the refusal to test from his record.

In June 2010, while his administrative appeal was still pending, plaintiff commenced this lawsuit to recover damages from LabCorp and ChoicePoint for the loss of his AME certification and airman certificates. The lawsuit alleged negligence and fraud in administering the test.

On August 1, 2011, the district court granted ChoicePoint's motion to dismiss (see Pasternack v Lab. Corp. of Am., US Dist Ct, SD NY, 10 Civ 4426, Gardephe, J., 2011]), concluding that plaintiff had not alleged any facts that supported a finding that ChoicePoint owed a duty of care to plaintiff. On September 6, 2012, the district court granted plaintiff's motion for leave to file a proposed second amended complaint as to LabCorp, but denied plaintiff's motion for leave to amend his complaint as to ChoicePoint, concluding that it would be futile (see Pasternack v Lab. Corp. of Am., 892 F Supp 2d 540 [2012]). Plaintiff filed a second amended complaint as to LabCorp, asserting claims for negligence, gross negligence, negligent misrepresentation, fraud, and injurious falsehood. Subsequently, the district court granted LabCorp's motion to dismiss (Pasternack v Lab. Corp. of Am., US Dist Ct, SD NY, 10 Civ 4426, Gardephe, J., 2014]), holding that with respect to the negligence claims, under New York law, LabCorp had no duty of care to properly apply federal drug testing regulations and guidelines, and regarding the fraud claims, that under New York

law, a fraud claim cannot be based on a false representation made to and relied upon by a third party whose reliance causes injury to the plaintiff.  On appeal to the Second Circuit, that Court certified the aforementioned questions of New York law to this Court (807 F3d 14 [2015]) and we accepted the certification of the questions (26 NY3d 1074 [2015]).

II.

### The Negligence Claims

Plaintiff alleges that ChoicePoint was negligent in mishandling the review and evaluation of his laboratory results in violation of the DOT Regulations.  Although he asserts that ChoicePoint violated numerous DOT Regulations, he cites two regulations in particular:  49 CFR § 40.123(3), which provides that the MRO "must act to investigate and correct problems where possible and notify appropriate parties . . . where assistance is needed . . .;" and 49 CFR § 40.355(i), which provides that, except where the employee has refused to test on the basis of adulteration or substitution, the MRO "must not make a determination that an employee has refused a drug or alcohol test" and that the ability to make such a determination "is a nondelegable duty of the actual employer."  Plaintiff argues that ChoicePoint failed to investigate the facts of his urine specimen collection and that it wrongfully designated him as a "refusal to test," despite the regulation's provision that the MRO is not to make such a determination.  Plaintiff asserts that this

designation was the sole reason for the FAA's revocation of his airman certificates and his AME designation.

With respect to LabCorp, plaintiff alleges that LabCorp failed to explain the "shy bladder" procedures and failed to inform him that leaving the collection site would or even could constitute a refusal to test, in contravention of CFR § 40.193(b) and the DOT Guidelines.

In order to prevail on a negligence claim, "a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom"(Solomon v New York, 66 NY2d 1026, 1027 [1985]).  In the absence of a duty, as a matter of law, there can be no liability (id. at 1028; see also Lauer v City of New York, 95 NY2d 95, 100 [2000]["(w)ithout a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm"]).  The definition and scope of an alleged tortfeasor's duty owed to a plaintiff is a question of law (see Palka v Servicemaster Mgmt. Corp., 83 NY2d 579, 585 [1994]).  As this Court observed in 532 Madison Avenue Gourmet Foods, Inc., v Finlandia Center (96 NY2d 280 [2001]), courts "fix the duty point by balancing factors, including the reasonable expectations of the parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new

channels of liability" (96 NY2d at 288 [internal quotations and citations omitted]).

The FAA does not provide a private right of action for violations of FAA drug-testing regulations (see Drake v Laboratory Corp. of America, 458 F3d 48, 64 [2d Cir 2006]). Thus, any duty to plaintiff for violations of the DOT Regulations and Guidelines must be based on a New York state common law negligence theory of liability.

We have recently addressed duty of care in the drug testing context in Landon v Kroll Lab. Specialists,Inc.(22 NY3d 1 [2013]).  In Landon, a drug testing laboratory allegedly performed a toxicology test in violation of industry-wide standards and failed to confirm the test, resulting in an erroneous report of drug use for a probationer.  We held that the probationer had sufficiently alleged a negligence cause of action against the laboratory for failing to exercise reasonable care in the testing of his biological sample, concluding that the laboratory had a duty of care to perform the probationer's drug test "in keeping with professional standards" (id. at 6-7).

Thus, in Landon we held that a drug testing laboratory can be liable to a test subject under the common law for negligent testing of a biological sample.  We decline to extend Landon's reasoning to impose a duty upon a laboratory to test subjects that requires the laboratory to adhere to aspects of the federal regulations and guidelines that do not implicate the

scientific integrity of the testing process.  We made clear in

Landon that our holding regarding a duty of care owed by the

laboratory to the plaintiff was limited to "th[o]se

circumstances" -- namely, a drug laboratory's failure to adhere

to professionally accepted scientific testing standards in the

testing of the biological sample.  It would be an unwarranted

extension of Landon to recognize a duty to test subjects based

upon the violation of ministerial federal regulations and

guidelines unrelated to scientific integrity, especially when

such regulations and guidelines are created to protect the

public, not test subjects.[2]  Landon's limited ruling regarding

the duty of care owed by laboratories to ensure accurate testing

procedures does not encompass every step of the testing process,

whether that process is governed by federal regulations and

guidelines, or otherwise (see e.g. In re New York City Asbestos

Litig., 5 NY3d 486, 493 [2005][A specific duty is required

because otherwise, a defendant would be subjected 'to limitless

liability to an indeterminate class of persons conceivably

injured' by its negligent acts"]; see also Braverman v Bendiner &

Schlesinger, Inc., 121 AD3d 353 [2d Dept 2014], lv denied 24 NY3d

913 [2015][plaintiff drug treatment program participant who

---

[2]The Sixth Circuit has observed that "[t]his regulatory
scheme does not evince a concern for the protection of
[employees] who believe that they have been aggrieved through the
drug testing process"(Perry v Mohawk Motors of Michigan, Inc.,
236 F2d 299, 309 [6th Cir 2000]).

alleged that laboratory was negligent in reporting positive results to the drug courts without labeling the results to indicate for 'clinical purposes only' sought an "unwarranted expansion of the duty set forth in Landon"]).  Recognizing a duty of care for any violation of federal regulations and guidelines unrelated to the actual performance of scientific testing of the biological sample would result in an unacceptable "proliferation of claims, [and] the likelihood of unlimited or insurer-like liability" (see Madison Ave, 96 NY2d at 288).[3]

In sum, the regulations and guidelines that are ministerial in nature and do not implicate the scientific integrity of the testing process do not create a duty of care for drug testing laboratories and program administrators under New York negligence law.

III.

The Fraud Claims

The second certified question requires us to decide whether third-party reliance can establish the reliance element of a fraud claim.  Plaintiff alleges fraud against LabCorp, contending that Montalvo, LabCorp's employee, made false statements to the FAA investigators, which they relied on to plaintiff's detriment.  Specifically, plaintiff points to

---

[3]Accordingly, plaintiff's proposed reformulation of the certified question to ask whether the common law duty of care that this Court recognized in Landon applies to FAA mandated drug tests, provides plaintiff no succor.

Montalvo's statement to the FAA investigators that plaintiff was on his cell phone and uncooperative during the test, making it impossible to warn him of the consequence of leaving the testing site without giving a sample, which statement the FAA relied on in revoking plaintiff's airman certificates.  We hold that under New York law, such third-party reliance does not satisfy the reliance element of a a fraud claim.

The elements of a fraud cause of action consist of "'a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury'"(Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 178 [2011], quoting Lama Holding Co. v Smith Barney, 88 NY2d 413, 412 [1996]; see Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 [2009]).  Federal courts applying New York law and the Appellate Division Departments have come to varying conclusions as to whether a plaintiff may state a fraud claim, despite the absence of reliance by the plaintiff on the alleged misrepresentations, where a non-plaintiff third-party is alleged to have relied on the misrepresentations in a manner that caused injury to the plaintiff.  The Second Circuit has held that "allegations of third-party reliance . . . are insufficient to make out a common law fraud claim under New York law" (City of New York v Smokes-Spirits.com, Inc., 541 F3d 425, 454 [2d Cir

2008], certified question answered 12 NY3d 616 [2009], revd and remanded on other grounds 559 US 1 [2010]; see Cement and Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Services Fund and Annuity Fund v Lollo, 148 F3d 194, 196 [2d Cir 1998]; Shaw v Rolex Watch, U.S.A., Inc., 673 F Supp 674, 682 [SD NY 1987]). Some district courts have applied the Second Circuit's rule (see Mid Atl. Framing, LLC v Varish Const., Inc., 117 F Supp 3d 145, 153 [ND NY 2015]; Ahluwalia v St. George's Univ., LLC, 63 F Supp 3d 251, 270 [ED NY 2014], affd 626 Fed Appx 297 [2d Cir 2015]), while others have held that, under New York law, third-party reliance can support a fraud claim (see Prestige Bldr. & Mgt. LLC v Safeco Ins. Co. of Am., 896 F Supp 2d 198, 205 [ED NY 2012]; Chevron Corp. v Donziger, 871 F Supp 2d 229, 257 [SD NY 2012]).

Similarly inconsistent is the Appellate Division case law, with the majority of cases declining to recognize third-party reliance and a few outliers adopting the opposite view (compare Bynum v Keber, 135 AD3d 1066, 1068 [3d Dept 2016]; Wildenstein v 5H & Co, Inc., 97 AD3d 488, 490 [1st Dept 2012]; Briarpatch Ltd., L.P. v Frankfurt Garbus Klein & Selz, P.C., 13 AD3d 296, 297 [1st Dept 2004], lv denied 4 NY3d 707 [2005]; Warren v Forest Lawn Cemetery and Mausoleum, 222 AD3d 1059, 1059 [4th Dept 1995][holding that a plaintiff cannot claim fraud based on third-party reliance], with Ruffing v Union Carbide Corp., 308 AD2d 526, 528 [2d Dept 2003] and Buxton Mfg. Co., Inc. v Valiant

Moving & Stor., Inc., 239 AD2d 452, 454 [2d Dept 1997][fraud may exist where a false representation is made to a third party, resulting in injury to the plaintiff]).

The cases that recognize third-party reliance cite favorably to Eaton Cole & Burnham Co. v Avery (83 NY 31, 35 [1880]). However, as noted by the District Court and Second Circuit here, Eaton is distinguishable from this case because in Eaton the third party acted as a conduit to relay the false statement to plaintiff, who then relied on the misrepresentation to his detriment (see also Bruff v Mali, 36 NY 200, 206 [1867]). Eaton and its progeny stand for the proposition that indirect communication can establish a fraud claim, so long as the statement was made with the intent that it be communicated to the plaintiff and that the plaintiff rely on it. Eaton does not support plaintiff's claim here, because Montalvo's statements were not relayed to plaintiff, and he did not rely on them. Plaintiff, in arguing that third-party reliance is sufficient to state a fraud claim under New York law, cites this Court's 1876 decision in Rice v Manley (66 NY 82 [1876]). There, the plaintiff contracted to purchase a quantity of cheese, and the defendant, aware of the plaintiff's contract, fraudulently induced the cheese vendor to deliver the cheese to him rather than the plaintiff. The defendant falsely told the vendor that the plaintiff no longer desired the cheese. We upheld a referee's determination that the defendant was liable to the

plaintiff for damages as a result of the fraud, observing that "it matters not whether the false representations be made to the party injured or to a third party, whose conduct is thus influenced to produce the injury" (id. at 87).  Notably, as recognized by the District Court here, in Rice v Manley, we stated that only two elements were required to sustain a fraud cause of action: fraud and damage (see id. at 84).  In more recent history, however, this Court has made clear that a fraud claim requires, in addition to damage, a material misrepresentation or omission, inducement, and reliance (see Mandarin Trading Ltd., 16 NY3d at 178; Eurycleia, 12 NY3d at 559; Lama Holding Co., 88 NY2d at 412; see also PJI Comment 3:20; 2d Ed., p. 184 ["Generally, a plaintiff cannot claim reliance on misrepresentation that defendant made to third parties" unless the representation was intended to be communicated to plaintiff and for plaintiff to rely on it]).  Thus, the holding in Rice rests upon antiquated elements of a fraud claim, and cannot be read to permit third-party reliance under the contemporary elements of the claim which clearly require reliance on the part of the party claiming to be fraudulently induced.

Indeed, this Court has stated on a number of occasions that a fraud claim requires the plaintiff to have relied upon a misrepresentation by a defendant to his or her detriment.  This view is both consistent with other rules governing fraud claims (see e.g. First Nat. State Bank of New Jersey v Irving Trust Co.,

91 AD2d 543, 544 [1st Dept 1982]["(T)here can be no liability in fraud where the complaining party is, in advance, fully knowledgeable and apprised of those matters as to which the representations are alleged to have deceived"], affd 59 NY2d 991 [1983]), and logical insofar as the tort of fraud is intended to protect a party from being induced to act or refrain from acting based on false representations -- a situation which does not occur where, as here, the misrepresentations were not communicated to, or relied on, by plaintiff. We, therefore, decline to extend the reliance element of fraud to include a claim based on the reliance of a third party, rather than the plaintiff.

Accordingly, the certified questions should be answered in accordance with this opinion.

Pasternack v Laboratory Corporation of America Holdings, Inc., et al.

No. 112

STEIN, J.(dissenting in part):

     I agree with, and join in, the majority opinion insofar as the majority responds to the second certified question regarding third party reliance in fraud claims.  However, I join Judge Fahey's dissent, for the reasons stated therein, with respect to the first certified question concerning the scope of the duty under Landon v Kroll Lab. Specialists, Inc. (22 NY3d 1 [2013]).

- 1 -

Pasternack v Laboratory Corp. of Am. Holdings

No. 112

FAHEY, J.(dissenting):

I respectfully dissent. I would reformulate the first certified question and answer it to say that, under New York common law, both a laboratory and a medical review officer (MRO) owe a duty of care to the subject of a drug test to conduct that procedure in keeping with professional standards. I would also reformulate the second certified question and answer it to say that, under New York common law, a plaintiff may establish the reliance element of a cause of action for fraud by showing that a third party justifiably relied on false statements or omissions of a defendant that were intended to influence the plaintiff.

The First Certified Question

A.

The first certified question asks "whether drug testing regulations and guidelines promulgated by the [Federal Aviation Administration (FAA)] and [Department of Transportation (DOT)] create a duty of care for drug testing laboratories and program administrators under New York negligence law" (Pasternack v Laboratory Corp. of Am. Holdings, 807 F3d 14, 24 [2d Cir 2015]).

- 1 -

Before posing that question, in <u>Drake v Laboratory Corp. of Am.</u> <u>Holdings</u> (458 F3d 48 [2d Cir 2006]) the Second Circuit observed that through the Federal Aviation Act (FAAct) "Congress granted the FAA broad authority over aviation safety, including the power to adopt regulations that it 'finds necessary for safety in air commerce and national security'" (<u>Drake</u>, 458 F3d at 56, quoting 49 USC § 44701 [a] [5]). In accordance with that directive, "in 1988, the FAA promulgated regulations mandating that all aviation-industry employees who perform safety-sensitive functions be subjected to random drug-testing" (<u>Drake</u>, 458 F3d at 56). Plaintiff is required to submit to mandatory drug testing pursuant to those regulations, which "incorporate by reference DOT regulations that set out . . . . [e]laborate rules for conducting drug tests" (<u>id.</u> at 56-57). As the majority notes (<u>see</u> majority op, at 8-9), those rules underlie this case.

Although its observations are instructive as to the regulatory backdrop to this matter, <u>Drake</u> is more important to my analysis for this conclusion that it drew: "the FAAct does not provide a private right of action for violations of FAA drug-testing regulations" (<u>Drake</u>, 458 F3d at 64). Based on that conclusion, I cannot agree with the majority that the Second Circuit now asks whether the common law of this state imposes upon those responsible for conducting FAA-mandated drug testing *a duty to adhere to the regulations* that establish the rules for performing such tests (<u>see</u> majority op, at 11). In my view that

question was basically answered through <u>Drake</u>'s determination
that there is no private right of action for the breach of an FAA
drug testing regulation.

Rather, the essence of the Second Circuit's query is
whether the common law of this state imposes upon those
responsible for performing FAA-mandated drug testing a *duty to
handle such testing with reasonable care*.  Consequently, to
provide appropriate guidance to the parties (see <u>generally</u> <u>Beck
Chevrolet Co., Inc. v General Motors, LLC</u>, ___ NY3d ___, 2016 NY
Slip Op 03412, at *5), I would reformulate the first certified
question to ask:

> Whether, under New York common law, entities
> that either perform an FAA-mandated drug test
> or review the results of such a test owe a
> duty of care to the subject of the test to
> conduct the test or to review the results of
> the test in keeping with relevant
> professional standards.[1]

---

[1]     The recast first certified question omits reference to
"drug testing regulations and guidelines promulgated by the FAA
and DOT" (<u>Pasternack</u>, 807 F3d at 24) by design.  The threshold
question of duty -- or responsibility -- in this instance is one
for the courts and turns on an analysis of law (see <u>Davis v South
Nassau Communities Hosp.</u>, 26 NY3d 563, 572 [2015]; <u>Purdy v Public
Adm'r of County of Westchester</u>, 72 NY2d 1, 8 [1988], <u>rearg</u> <u>denied</u>
72 NY2d 953 [1988]), not of regulations and guidelines.  Once it
is determined that a duty exists, the secondary question whether
that responsibility has been breached may be answered by, among
other things, evidence of the violation of pertinent rules or
regulations (see <u>generally</u> <u>Bauer v Female Academy of Sacred
Heart</u>, 97 NY2d 445, 454 [2002]; <u>Elliott v City of New York</u>, 95
NY2d 730, 734 [2001]; <u>Landry v General Motors Corp., Cent.
Foundry Div.</u>, 210 AD2d 898, 898 [4th Dept 1994]).  To that end,
in the context of this case the question of compliance with the
FAA and DOT regulations and guidelines becomes relevant only if

B.

As reformulated, I would answer the first certified question in the affirmative.

In Landon v Kroll Lab. Specialists, Inc. (22 NY3d 1 [2013]) we considered the question whether the plaintiff, who was subject to drug testing conducted by the defendant laboratory on behalf of a county as part of his probation, had stated a cause of action against the laboratory for the alleged negligent testing of his biological sample (see id. at 3). In furtherance of such testing, the plaintiff provided the laboratory with an oral sample, and he obtained an independent blood test as well to protect himself against a false positive. The blood sample "came back negative for illicit and controlled substances," but the laboratory "detected the presence of cannabinoids in the oral sample" that exceeded a cutoff level of one nanogram (ng) per millileter (ml) (id. at 4). Consequently, the laboratory generated a written report reflecting that the plaintiff had tested positive for marihuana, which, in turn, caused the county probation department to commence a violation proceeding against the plaintiff based on his alleged breach of the conditions of his probation precluding his use of that drug (see id.).

The violation proceeding eventually was terminated in the plaintiff's favor, and he subsequently commenced an action

---

it is determined that defendants owed a duty to plaintiff to properly conduct the drug test.

against the laboratory based, in relevant part, on the theory that the laboratory negligently issued the report reflecting the positive test result. As alleged in the complaint, the cutoff level recommended by the manufacturer of the device by which the oral fluid was taken from the plaintiff was 3.0 ng/ml, whereas the standards of the United States Department of Health and Human Services Substance Abuse and Mental Health Services Administration (SAMHSA) recommended a cutoff level of 4.0 ng/ml. That is, pursuant to those standards, more than the 1.0 ng/ml of cannabinoids found by the laboratory was required to establish a positive result for that substance. The complaint further alleged that the laboratory ignored New York State Department of Health Laboratory and SAMHSA standards designed to guard against a false positive test result, and that the erroneous test results were the product of the laboratory's systemic negligence in its substance abuse testing practices (see id. at 4-5).

The laboratory moved to dismiss the complaint pursuant to CPLR 3211 (a) (7) for failure to state a cause of action. We concluded that the complaint was sufficient to withstand the motion (see Landon, 22 NY3d at 3) inasmuch as the plaintiff had alleged that the laboratory "did not exercise reasonable care in the testing of [the] plaintiff's biological sample when [the laboratory] failed to adhere to professionally accepted testing standards [before] releas[ing] a report finding that [he] had tested positive for THC," a psychoactive compound in marihuana

(id. at 6). We subsequently clarified that the laboratory "had a duty to the [plaintiff] to perform his drug test in keeping with relevant professional standards" (id. at 6-7), which, importantly, was based upon our recognition of the "profound . . . consequences" of "the release of a false positive report" (id. at 6).

Said simply, Landon articulated a duty to act with reasonable care to prevent a false positive drug test result. There the duty applied to the laboratory responsible for the testing of the plaintiff's biological samples inasmuch as the laboratory was "in the best position to prevent false positive results" (id.; see Davis, 26 NY3d at 572 ["A critical consideration in determining whether a duty exists is whether the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm"] [internal quotation marks omitted]).

Here the entities best positioned to prevent what plaintiff claims was essentially a false positive result are defendants, which, respectively, administered plaintiff's drug test (defendant Laboratory Corporation of America Holdings [LabCorp]) and employed the MRO who certified the results of that examination (defendant ChoicePoint, Inc.). To conclude that defendants owed a duty to plaintiff to prevent the erroneous test result here is not to extend Landon (cf. majority op, at 11), but merely to apply to this case its core teaching that those

situated similarly to the laboratory there in question have a duty to act with reasonable care to prevent a false positive drug test result.

Defendants contend that this case is distinguishable from Landon in that the actions challenged here resulted in the allegedly negligent reporting of a refusal to test, as opposed to a false positive result in the strictest sense. This is not a rational basis for distinguishing Landon which, in my view, did not restrict the duty of care to "scientific" errors but, rather, more broadly imposed a standard of reasonable care with regard to the testing process and administration. Indeed, a negligent and erroneous determination that a subject refused to test causes the same harm as a false positive. This is clearly evidenced by the circumstances here, in which plaintiff was stripped of his qualifications and, as a result, allegedly lost significant employment.

Consequently, I would answer the first certified question, as reformulated, in the affirmative so as to say that a laboratory and an MRO owe a duty to the subject of a drug test to conduct that test in keeping with relevant professional standards which, in the FAA context, are defined by the regulations governing the drug testing process (see Drake, 458 F3d at 65 [a subject "may seek state-law remedies for violations of the federal regulations, (but) state law cannot enlarg(e) or enhanc(e) the regulations to impose burdens more onerous than

those of the federal requirements"] [internal quotation marks
omitted]).  Contrary to the majority's assertion, recognition
that plaintiff's claims here fall within the scope of the duty
under Landon would not likely result in a proliferation of
claims.  First, the potential pool of plaintiffs is clearly and
easily delineated and identified -- namely, the duty runs to the
individual test subject, the most obvious third party to be
harmed by this type of alleged negligence.[2]  Second, to the
extent the majority expresses concern that maintaining the Landon
duty for violations of regulations other than those governing the
"scientific integrity" of the test would open the floodgates
(majority op, at 11), such concern is also misplaced.  To be
sure, the regulations governing the testing process and
administration are numerous.  However, recognition of a duty to
complete FAA drug testing with reasonable care, as informed by
the regulations, would not relieve a plaintiff of his or her
burden to demonstrate that the regulations were actually breached
and that the violation of the regulations was causally related to
his or her injuries.[3]  To that end, true "ministerial"

---

[2]     While the majority is correct that the primary aim of
the drug testing procedures is to ensure the safety of the
public, the MRO process is structured, at least in part, to
provide safeguards to protect the employee test subject from the
consequences of an erroneous result or determination (see Spiker
v Sanjivan PLLC, 2013 WL 5200209, at *15 [D Ariz, Sept. 16, 2013,
No. CV-13-00334-PHX-GMS]).

[3]     I express no opinion as to whether the complaint or
evidence is sufficient with respect to these elements.

regulations are unlikely to be sufficient to sustain a successful cause of action for negligence.

For the foregoing reasons, I disagree with the majority's answer to the first certified question.

### The Second Certified Question

The second question asks "whether a plaintiff may establish the reliance element of a fraud claim under New York law by showing that a third party relied on a defendant's false statements resulting in injury to the plaintiff" (Pasternack, 807 F3d at 24). I agree with the majority that, at its core, that question asks "whether third-party reliance can support the reliance element of a fraud claim" (majority op, at 12). To provide appropriate guidance to the parties, I would reformulate the second certified question to ask:

> Whether a plaintiff may establish the reliance element of a cause of action for fraud under New York law by showing that a third party relied on a defendant's false statements resulting in injury to the plaintiff where the statements were made with the intent of influencing the plaintiff and causing injury.

As reformulated, I would answer the second certified question in the affirmative. That is, unlike the majority (cf. majority op, at 13, 16-17), I would conclude that the reliance element of a cause of action for fraud may be established through evidence that a third party relied on the alleged misrepresentation if the misrepresentation was made with the intent of influencing the plaintiff and causing injury.

"The elements of a cause of action for fraud require [1] a material misrepresentation of a fact, [2] knowledge of its falsity, [3] an intent to induce reliance, [4] justifiable reliance by the plaintiff and [5] damages" (Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 [2009]).  At issue is the reliance element, which speaks to the rule that "[t]he reliance must be justifiable in the sense that the party claiming to have been defrauded was justified both in believing the representation and in acting upon it" (2A NY PJI 3:20 at 192 [2016]).  Inasmuch as "'there can be no liability in fraud where the complaining party is, in advance, fully knowledgeable and apprised of those matters as to which the representations are alleged to have deceived'" (First Natl. State Bank of N.J. v Irving Trust Co., 91 AD2d 543, 544 [1st Dept 1982], affd on opinion below 59 NY2d 991 [1983], quoting 200 E. End Ave. Corp. v General Elec. Co., 5 AD2d 415, 418 [1st Dept 1958], affd 6 NY2d 731 [1959]), "[t]he [relevant] question . . . is whether the person claiming to have been deceived 'knew or had reason to know' the facts" (2A NY PJI 3:20 at 194 [2016], citing Angerosa v White Co., 248 App Div 425 [4th Dept 1936], affd 275 NY 524 [1937]).

There is another key component to the reliance element of a cause of action for fraud.  At times we have suggested that the *plaintiff*, that is, the party claiming to have been defrauded, must have justifiably relied on the material

misrepresentation of fact (see e.g. Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 178 [2011], quoting Lama Holding Co. v Smith Barney, 88 NY2d 413, 421 [1996]) for the proposition that, "[g]enerally, in a claim for fraudulent misrepresentation, a plaintiff must allege[, inter alia,] 'a misrepresentation or a material omission of fact . . . made for the purpose of inducing the other party to rely upon it, [and] justifiable reliance of the other *party* on the misrepresentation or material omission'" [emphasis added]; Eurycleia Partners, LP, 12 NY3d at 559 ["The elements of a cause of action for fraud require . . . justifiable reliance by the *plaintiff*"] [emphasis added]).  At other times, however, our approach has been vague with respect to the reliance element inasmuch as we have declined to specifically say that it is the plaintiff that must have justifiably relied on the alleged misrepresentation (see e.g. Vermeer Owners v Guterman, 78 NY2d 1114, 1116 [1991]).  The issue thus becomes whether a plaintiff may establish the reliance element of a cause of action for fraud where a third party is the recipient of the misstatement or omission.  In my view, the reliance element of a cause of action for fraud may be established by showing the reliance of a third party on false statements made by a defendant if it is established that the defendant intended[4] for those statements to

---

[4]         Fraud, of course, is an intentional tort (see generally Simcuski v Saeli, 44 NY2d 442, 451 [1978]; 2A NY PJI 3:20 at 166 [2016]) and, as noted, one of its elements is "intent to induce reliance" (Eurycleia Partners, LP, 12 NY3d at 559).  It

influence the plaintiff.

That conclusion -- that third party reliance may support a cause of action for fraud where there is an intent on the part of the defendant that the misrepresentation or omission influence the plaintiff through the proxy of the third party -- is compatible with existing case law.  It is true that the Appellate Division, First Department, has ruled that a plaintiff "[g]enerally . . . cannot claim reliance on misrepresentations a defendant made to third parties" to establish a cause of action for fraud (Wildenstein v 5H&Co, Inc., 97 AD3d 488, 490 [1st Dept 2012]), and the Fourth Department has taken a similar approach (see Warren v Forest Lawn Cemetery & Mausoleum, 222 AD2d 1059, 1059 [4th Dept 1995] ["Plaintiff is not a proper party to allege fraud because no misrepresentation was made to him, nor did he allege that he relied on any misrepresentation"]).  The Second Department has at times taken the same approach (see Garelick v Carmel, 141 AD2d 501, 502 [2d Dept 1988] ["to plead a valid cause of action sounding in fraud, the complaint must set forth all of the elements of fraud including the making of material representations by the defendant to the plaintiff"]), but its jurisprudence also provides that a defendant may be liable for

---

follows that, where a plaintiff alleges that a third party, not the plaintiff, justifiably relied on a material misrepresentation or omission, the plaintiff should be required to establish that the defendant intended for the misrepresentation or omission to influence the plaintiff.

fraud based on false statements made to a governmental agency that result in harm to a third party (see Buxton Mfg. Co. v Valiant Moving & Stor., 239 AD2d 452, 453-454 [2d Dept 1997] [holding that the defendant could be liable for fraud for false statements made to and relied on by Department of Agriculture (DOA), resulting in injury to plaintiff; the statements at issue caused the DOA to disburse funds that, absent the disputed statements, would have been used to pay the plaintiff's outstanding claims]; see also Ruffing v Union Carbide Corp., 308 AD2d 526, 528 [2d Dept 2003] [citing Buxton with approval]).

Although the Second Department's decision in Buxton does not specifically say that the defendant's false representation to a third party was made with the intent to influence the plaintiff, the "exception" to the normal reliance rule in that case is natural. Buxton's conclusion that "[f]raud . . . may . . . exist where a false representation is made to a third party, resulting in injury to the plaintiff" (Buxton, 239 AD2d at 454) is based in part on this Court's decision in Eaton, Cole & Burnham Co. v Avery (83 NY 31 [1880]). In Eaton, an action for deceit was supported by allegations of false representations "made [to a mercantile agency] with the intent that they should be communicated to and believed by [the plaintiff, who was] interested in ascertaining the pecuniary responsibility of" another business for the purpose of determining whether to deliver goods to that business (id. at

33).

Eaton was also cited by the First Department in Desser
v Schatz (182 AD2d 478 [1st Dept 1992]) for the proposition that
the fact "that the false representation was not made directly to
[the] plaintiff" was "of no moment" with respect to the allegedly
fraudulent representation there at issue (id. at 479-480).  So
too was Eaton referenced by the Third Department in Bynum v Keber
(135 AD3d 1066, 1068 [3d Dept 2016]), where that court recognized
the third-party reliance doctrine and suggested that a
misrepresentation made for the purpose of being communicated to
the plaintiff or with the intent of reaching and influencing the
plaintiff may support a cause of action for fraud.  Moreover,
Eaton is consistent with Bruff v Mali (36 NY 200, 206 [1867]),
where this Court ruled that "defendants[,] having issued the
false certificates of stock authenticated by them as genuine, and
cast them upon the market with fraudulent intent, are liable to
every holder to whose hands they may come by fair purchase," and
compatible with Rice v Manley (66 NY 82, 87 [1876]), where we
said that "[t]he mere forms adopted for the perpetration of
frauds are of little importance; it matters not whether the false
representations be made to the party injured or to a third party,
whose conduct is thus influenced to produce the injury, or
whether it be direct or indirect in its consequences."[5]

_____

    [5]    I take no position with respect to the majority's
belief that "Eaton does not support plaintiff's claim here"
(majority op, at 15).  In my view, our present task is not to

Perhaps Prosser said it best:

> "while [a] defendant is not required to
> investigate or otherwise guard against the
> possibility that his [or her] statements may
> come into the hands of strangers and affect
> their conduct, his [or her] *responsibility*
> [for those statements] *should at least extend*
> *to those who might reasonably be expected to*
> *assume from appearances that the*
> *representation was intended to reach them*"
> (Prosser & Keeton, Torts, § 107 at 745 [5th
> ed 1984] [emphases added]).

In practice, to reject the third-party reliance doctrine is to facilitate the commission of fraud by straw man and to ease the practice of deceit. Consequently, I respectfully disagree with the majority that a plaintiff cannot meet the reliance element of a cause of action for fraud through a third-party's reliance on a misrepresentation (see majority op, at 17). I would reformulate the second certified question and answer it to say that a plaintiff may establish the reliance element of a cause of action for fraud through evidence that a third party relied on the defendant's alleged misrepresentation if that misrepresentation was made with the intent of influencing the plaintiff and causing injury.

---

determine whether the law supports plaintiff's case, but "to provide certainty to and settlement of [this state] law issue[]" (Bocre Leasing Corp. v General Motors Copr. [Allison Gas Turbine Div.], 84 NY2d 685, 691 [1995]).

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Following certification of questions by the United States Court
of Appeals for the Second Circuit and acceptance of the questions
by this Court pursuant to section 500.27 of this Court's Rules of
Practice, and after hearing argument by counsel for the parties
and consideration of the briefs and the record submitted,
certified questions answered in accordance with the opinion
herein.   Opinion by Judge Abdus-Salaam.  Chief Judge DiFiore and
Judges Pigott and Garcia concur.  Judge Stein dissents in part in
an opinion.  Judge Fahey dissents in an opinion in which Judge
Rivera concurs.


Decided June 30, 2016